UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANGELA MELISSA KRAFT | * | CIVIL ACTION NO. 20-2687 |
| | * | |
| VERSUS | * | SECTION: "J"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE CARL J. BARBIER |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *********************************** | * | |

<u>REPORT AND RECOMMENDATION</u>

The plaintiff, Angela Melissa Kraft, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 20) be GRANTED.

**<u>Procedural Background</u>**

Ms. Kraft applied for DIB on September 25, 2018, asserting a disability onset date of April 26, 2017.[1] She alleged the following illnesses, injuries, or conditions:  thoraco-lumbar scoliosis from T-11 to L-6, osteoarthritis of entire spine and left knee, spinal stenosis in C-spine and L-spine, anterior spurring throughout all levels of spine, high cholesterol, high blood pressure, hardening of the arteries, angina, chronic back pain, and PTSD from the loss of her daughter. Ms. Kraft obtained counsel soon thereafter. On February 16, 2019, her claim was denied by the state

---

[1] Ms. Kraft previously filed two applications for DIB that were denied. R. at 76-77, 103. In the most recent, an Administrative Law Judge determined on April 25, 2017, that she was not disabled under the Act as of that date. R. at 103.

agency. A request for reconsideration was filed on March 14, 2019. No new sources were reported, and on May 2, 2019, the state agency affirmed the denial.

Ms. Kraft requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 13, 2019. On January 3, 2020, the ALJ issued an adverse decision. Ms. Kraft timely appealed to the Appeals Council, which denied review on July 31, 2020.

On October 1, 2020, Ms. Kraft filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 11, 14). The parties filed cross-motions for summary judgment. (Rec. Docs. 19, 20). Ms. Kraft is represented by counsel.

## **Evidence in the Record**

*Hearing Testimony*

Ms. Kraft was 51 years old at the time of the second hearing on December 13, 2019. R. at 32. She testified that she earned a Bachelor of Science in nursing in 1999 and worked as a registered nurse for a number of years. R. at 32, 36. She last worked as a cashier for Community Loans in August 2012, although she also performed other duties. R. at 35.

Ms. Kraft testified that when she was working at Community Loans, she suffered from lower back pain and that twisting to use the printer on her side caused pain and numbness in her arms. R. at 50. The pain caused her to resign. Id. She also had trouble with handwriting. R. at 51.

Ms. Kraft explained that she is no longer able to work because of her back. R. at 37. She gets numbness between her shoulder blades. Id. She cannot tell when she feels hungry because of her scoliosis and, as a result, she forgets to eat. Id. She also suffers from PTSD because her daughter died unexpectedly in 2013. Id. Ms. Kraft had performed CPR on her daughter, but she was already gone. Id.

Ms. Kraft lives with her husband and adult son. R. at 34. Her husband does most of the cooking and housework. R. at 42. He also does most of the grocery shopping, though Ms. Kraft noted that in 2017 she would make an occasional trip to Walmart. R. at 48. Ms. Kraft said that if she is washing dishes and loading the dishwasher, she can only stand for 15 minutes before her back starts hurting to the point of feeling nauseated. R. 42. Then she has to take a 30 minute break. Id.  She also reported difficulty folding laundry. Id.

Ms. Kraft described a typical day in 2017. R. at 45. She would wake up and take her pain medication, get a cold drink, and then go back to her room to watch TV, lying on her side until the medication kicked in. Id. On good days she would go on to the dishes and take breaks, but on other days she would get carried away with the TV and just walk back and forth, maybe to eat something. Id.  She testified that she spent most of the day lying down and sitting. Id. When taking the garbage can down her 150 yard driveway to the curb, she would stop three times to catch her breath from the pain. R. at 46. Ms. Kraft has a driver's license, but she testified that she does not drive as much as she used to. R. at 34.

Ms. Kraft testified that if she sits for more than half an hour, her legs start to fall asleep. R. at 46. She testified that she can stand for only 10-15 minutes before getting severe pain in her lower back. Id.  She testified that if she has to walk more than 20-30 feet, she has to take breaks because of the pain. Id.  Ms. Kraft testified that her condition has gotten worse with age, but she could not say whether it had gotten worse on a specific date or after her earlier hearing before an ALJ on February 21, 2017. R. at 40.

Ms. Kraft stated that she uses a walker occasionally when she has balance issues, noting that she had to use a walker after injuring her ankle in 2017. R. at 32-33. The injury occurred because her leg was asleep and she caught her toes on the carpet and fell. R. at 33.

Ms. Kraft also explained that she hired people to help her clean her house and finish unpacking in June 2017. R. at 43. She testified that around that time she was having falls about twice a week and that she reported this to her doctor. R. at 44. For example, she said she was taking Zanaflex, a strong muscle relaxer, at bedtime. Id. But if she got up after taking it, the room would go black and she would hit the floor. Id.  Eventually, her doctor discontinued the medication because of this side effect. Id.

Ms. Kraft testified that she had not seen her therapist in about a year and a half because he never responded back when she reached out about appointments. R. at 37. She also said she felt they had reached a plateau and added that they had discovered that the therapist had been married to and divorced from Ms. Kraft's distant cousin and they got to a point where he wanted to talk about family and it was not getting her where she needed to be. R. at 37-38. The ALJ noted that they had requested records from the therapist, but he responded on February 7, 2019, that he had not treated her recently and did not have any records. R. at 38. Ms. Kraft testified that she stopped seeing the therapist at the end of 2017 or early in 2018. Id.

Ms. Kraft takes Celexa daily and Xanax as needed for anxiety. R. at 39. She also took Ambien daily to sleep. Id.  She testified that she may have been taking Valium in 2017. Id.  Ms. Kraft was also taking Norco and MS-Contin, a morphine derivative, at that time. R. at 49. She believes that pain medication causes problems with her memory and concentration. Id. She explained that because of the effects on her cognitive abilities, she would not be able to perform

her job at Community Loans. R. at 50. Ms. Kraft also reported difficulty concentrating, retaining, and thinking clearly. R. at 46.

Vocational expert Christi McCaffery testified at the hearing. R. at 25. Because Ms. Kraft had not worked since the previous hearing, her counsel stipulated to the classification of Ms. Kraft's past work by the vocational expert at that hearing. R. at 54. Her past work was (1) cashier I, DOT 211.362-010, sedentary, SVP 5 and (2) registered nurse, DOT 075.364-010, medium, SVP 7. R. at 55.

The ALJ asked the vocational expert to consider a hypothetical individual of the same age, work experience, and educational background as Ms. Kraft who is limited to light work; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, crouch, and crawl; and can frequently balance and kneel. R. at 55-56. The vocational expert testified that this person could return to Ms. Kraft's previous work as a cashier. R. at 56.

Next the ALJ asked the vocational expert to consider a hypothetical individual of the same age, work experience, and educational background as Ms. Kraft who is limited to light work; can occasionally stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; cannot work on vibrating surfaces; and can only perform work of a simple, routine nature with occasional interaction with the public. Id. The vocational expert testified that this person could not perform Ms. Kraft's previous work. Id. But she testified that there would be other jobs available in the national economy that this person could perform, such as housekeeping cleaners, DOT 323.687-014, unskilled, light work, with 455,193 jobs in the United States; janitors and cleaners, DOT 389-687-10, unskilled, light work, with 173,954 jobs in the United States; and production worker, DOT 706.684-022, unskilled, light work, with 200,849 jobs in the United States. Id.

The ALJ asked the vocational expert to consider a third hypothetical individual of the same age, work experience, and educational background as Ms. Kraft who is limited to the full range of sedentary work. R. at 56-57. The vocational expert testified that this person could return to Ms. Kraft's previous work as a cashier. R. at 57.

The ALJ asked the vocational expert to consider a fourth individual of the same age, work experience, and educational background as Ms. Kraft who is limited to sedentary work; can only perform simple, routine work; can have occasional interaction with the public; and can understand, remember, and carry out simple instructions. Id. The vocational expert testified that this person could not return to Ms. Kraft's previous work. Id. There would be no transferable skills form the prior jobs. Id.

The ALJ asked the vocational expert to consider a fifth individual that, in addition to any of the previous limitations, was also limited to performing seven hours of work in an eight-hour workday. Id. The vocational expert testified that there would be no jobs in the national economy for such an individual. Id.

Ms. Kraft's attorney asked the vocational expert to consider a hypothetical person limited to unskilled and sedentary work with an option to alternate between sitting, standing, and walking every 15-30 minutes; occasional reaching, twisting, and turning in all directions; and no balancing on uneven terrain. R. at 59-60. The vocational expert testified that this person would not be able to perform sedentary work because the alternating between positions would take her off task. R. at 60.

*Medical Records*

Upon referral from Dr. Charles Genovese, Ms. Kraft began visiting Spectrum Neurology Center for chronic back pain on February 19, 2015. R. at 278.

An MRI of Ms. Kraft's thoracic spine was performed on June 24, 2015. R. at 510. Advanced C5-6, C6-7 degenerative disc disease/spondylosis was noted. R. at Id.  Mild rotary scoliosis deformity of the thoracic spine; mild anterior wedging of the T1 vertebral body; and multilevel mild degenerative thoracic disc disease, spondylosis were also noted. Id.

An MRI of the lumbar spine was also performed on June 24, 2015. R. at 512. Clinical history included scoliosis and mild low back and lower extremity pain. Id.  The following impressions were noted: comparatively mild L3-4 level degenerative disc disease with generalized and multilevel moderately advanced degenerative lumbar hypertrophic facet joint arthropathy. R. at 513. It was also noted that in comparison to the prior study of June 5, 2013, it was a stable examination with the possible exception of subtly interval progressive degenerative changes and multilevel mild to moderate foraminal narrowing, not overly impressive, perhaps most significant at the L1-2, L2-3 levels on the right.  Id.  As on the prior study, the radiologist observed locally prominent levoscoliotic deformity of the upper lumbar spine centered at L2-3 with chronic right lateral wedging of the L2 vertebral body and findings of advanced L1-2, L2-3 level degenerative disc disease/spondylosis, asymmetric to the right. Id.

On October 7, 2016, an x-ray of the thoracolumbar spine was conducted for scoliosis. R. at 338. Thirty-six degree levoconvex lumbar scoliosis with apex at L2 was observed.[2] Id. She treated at Spectrum with Dr. Beaucoudray the same day. R. at 335. She reported intermittent numb tingling dull pain radiating from the neck and back. Id.  She reported this was worse with prolonged periods of sitting, standing, or periods of activity. Id. Nonetheless she reported that medication was beneficial as it improved her overall functioning as well as quality of life. Id. She denied any

---

[2] An undated record among Dr. Charles Genovese's notes states, "lumbar scoliosis, extreme at L2- 36." R. at 483.

side effects of medication. Id.  Upon examination, Ms. Kraft was in no acute distress, she had 5/5 motor strength in all extremities; tenderness to palpation of the cervical and lumbar paraspinals, bilaterally; restricted range of motion on extension of both cervical and lumbar spine; and sensation intact in all extremities. R. at 336. Her gait was antalgic, but she had no ataxia or unsteadiness and no assistive devices for ambulation or standing. Id. She had a normal mood and affect. Id. She was prescribed MS Contin and Norco. R. at 337.

Ms. Kraft returned to Spectrum on December 9, 2016. R. at 331. She voiced similar complaints, though also complained of breakthrough pain, often in the evening hours. Id. Physical examination was the same as on the previous visit. R. at 332.  MS Contin was increased and Norco was reduced. R. at 333.

Ms. Kraft presented to Dr. Charles Genovese on January 12, 2017. R. at 493. He appears to note "usual pain" and "multiple falls." [3]  Id.  Ms. Kraft returned to Dr. Genovese on February 20, 2017. R. at 492. He noted that she met with a disability attorney. Id.  She was in a good mood. Id.

Ms. Kraft presented at Spectrum on February 6, 2017. R. at 327. She denied changes in the quality of pain but noted intermittent numb tingling pain radiating from the neck and back, often with prolonged periods of activity. Id.  Nonetheless she reported that medication was beneficial as it had improved her overall functioning and allowed her to continue to participate in daily activities. Id. She denied any side effects. Id. Physical examination was the same as on the previous visit, except for "reports of subjective complaint of numb, tingling, paid radiating down the left

---

[3] Dr. Genovese's medical records are handwritten and, at times, illegible.

lower extremity." R. at 328. Ms. Kraft had benefited from the recent adjustment to the treatment plan and the current medication was continued. R. at 329.

Ms. Kraft presented to the Emergency Department at the North Oaks Medical Center ("NOMC") Hospital on April 2, 2017, by ambulance because of abdominal pain and dizziness, vomiting with blood, and diarrhea with blood. R. at 375-76. While at the hospital, normal range of motion in the extremities was noted on April 3, 2017, and April 4, 2017. R. at 385, 390. She was discharged on April 5, 2017. R. at 398.

Ms. Kraft treated at Spectrum on April 13, 2017. R. at 323. She denied change in the quality of pain, but noted dull aching pain radiating from the neck and back that was worse with prolonged periods of sitting and standing. Id.  Nonetheless she reported that medication was beneficial as it had improved her overall functioning and allowed her to continue to participate in daily activities. Id. She denied any side effects. Id. Upon examination, Ms. Kraft was in no acute distress, she had 5/5 motor strength in all extremities; tenderness to palpation of the cervical and lumbar paraspinals, bilaterally; restricted range of motion on extension of both cervical and lumbar spine; and sensation intact in all extremities. R. at 324-25. Her gait was antalgic, but she had no ataxia or unsteadiness and no assistive devices for ambulation or standing. Id. She had a normal mood and affect. Id. She was continued on MS Contin and Norco. R. at 325.

Ms. Kraft returned to Dr. Genovese on April 17, 2017. R. at 491. Gastrointestinal bleeding was noted. Id.  In a record dated May 17, 2017, Dr. Genovese noted that a judge had tried Ms. Kraft's disability case. R. at 496.

Following Ms. Kraft's previous hearing before an ALJ in 2017, her attorney asked Dr. Beaucoudray at Spectrum to answer some questions about Ms. Kraft's condition. R. at 514. In a form dated June 2, 2017, Dr. Beaucoudray opined that Ms. Kraft has chronic neck and low back

pain requiring narcotic medications. Id. He opined that alternating positions would provide her only limited adjustment however she would still have limited ability to tolerate full time work. R. at 514-15. He further opined that her chronic narcotic medications may cause drowsiness and cognitive slowing and that pain can also be distracting. R. at 515. Further, he added that she is noted to have underlying depression which is worsened by chronic pain. Id.

Ms. Kraft's first visit with Dr. Beaucoudray at Spectrum during the relevant period was on June 12, 2017. R. at 318. She reported doing well and that although she has good days and bad days, she was overall content with the current treatment plan. R. at 318. She reported a dull aching pain radiating from the neck and back that is worse with damp weather. Id. She reported that medication was beneficial as it had improved her overall functioning and allowed her to continue to participate in daily activities. Id. She denied any side effects. Id. Physical examination was the same as at her April 2017 visit. R. at 319. She was continued on MS Contin and Norco. R. at 320.

Ms. Kraft returned to Dr. Genovese on June 14, 2017. R. at 490. He noted that she had hired someone to clean her house and that they robbed her. Id. He noted she had seen the nurse practitioner about height loss of two inches. Id. Upon physical examination, her mood was good and she had diffuse tenderness in her cervical, thoracic, and lumbar spine. Id.

An x-ray of the thoracic spine was performed at NOMC Hospital on July 10, 2017, and revealed mild multilevel degenerative disease. R. at 430. An x-ray of the lumbar spine was performed the same day and revealed progression of moderate degenerative disc disease, increase in lateral curvature of the lumbar spine, and possible splenic artery aneurysm. R. at 431. There was no evidence of spondylosis. Id. An x-ray of the cervical spine was also performed and showed moderate degenerative disc disease at C5-6 and C6-7. R. at 432.

She returned to Dr. Genovese on July 12, 2017. R. at 497. The x-rays were reviewed. Id. On physical examination, it was noted that her mood was good and she had diffuse tenderness in her spine. Id.

Ms. Kraft presented at the Emergency Department at NOMC Hospital again on July 26, 2017, complaining of abdominal pain on her left side since July 14, 2017. R. at 366. Normal range of motion was noted under musculoskeletal and neck. R. at 367.

Ms. Kraft returned to Spectrum on August 10, 2017. [4] R. at 315. She reported continued dull aching pain radiating from the neck and back that was worse with prolonged periods of activity. Id. Results of physical examination were the same as her previous visit. R. at 316. Medications remained the same. R. at 317.

Ms. Kraft returned to the Emergency Department at NOMC Hospital on August 20, 2017, with right ear pain for the past 11 days. R. at 364. Upon physical examination it was noted that her neck was supple and had normal range of motion. R. at 365.

Ms. Kraft returned to Dr. Genovese on September 5, 2017. R. at 498. Usual back pain was noted. Id. Her mood was good. Id.

Ms. Kraft presented at the Emergency Department at NOMC Hospital on September 16, 2017, complaining that she had rolled her ankle. R. at 362. She explained that she got up and stepped down on her foot when her foot was plantarflexed resulting in sudden onset left ankle pain. R. at 362. She was negative for neck pain and stiffness. Id.

She returned to Spectrum on October 5, 2017, reporting ongoing neck and low back pain. R. at 311. Results of physical examination were the same as her previous visit. R. at 312. It was

---

[4] Ms. Kraft also treated with Dr. Genovese on August 8, 2017, but none of the notes are legible. R. at 489.

noted that her medications continued to offer her benefit in improving overall function. R. at 313.

Medications remained the same. Id.

Ms. Kraft returned to Dr. Genovese on October 18, 2017. R. at 488. She reported that her leg went to sleep and that she got up and fell. Id. She followed up on November 21, 2017. R. at 499. It was noted that she had good range of motion but also diffuse lumbar tenderness. Id. Her mood was good. Id.

She followed up at Spectrum on December 6, 2017, reporting dull aching pain radiating from the neck and back that is worse with prolonged periods of activity and affected by the colder weather. R. at 308. She reported that medication is beneficial and improved her overall functioning and allows her to continue to participate in daily activities. Id. She denied any side effects. Id. Results of physical examination were the same as her previous visits. R. at 309. Medications also remained the same. R. at 310.

She followed up at Spectrum on January 30, 2018. R. at 305. She denied any change in the quality of her pain, but reported an episode of falling. Id. When she stood up her legs gave out on her without any warning and it felt as if her knees buckled. Id. She denied any injury and denied any further recurrences. Id. Her medication continued to be beneficial in improving overall functioning and allowing her to continue to participate in daily activities. Id. She denied side effects. Id. Results of physical examination were the same as her previous visit. R. at 306. Medications also remained the same. R. at 307.

Ms. Kraft also presented at the Emergency Department of the NOMC Hospital on January 30, 2018, complaining of weakness in her legs over the past two weeks. R. at 359. She reported that she just "drops" with no pain or warning and has to hold on to furniture. Id. She told a second nurse that her legs had been giving out intermittently for approximately one month. Id. She denied

numbness, tingling, or other symptoms. Id. She denied weakness. Id. Elsewhere in the same record, it is noted that she presented for progressive weakness in bilateral extremities for about two weeks. R. at 360. It was noted that she was on multiple medications including benzodiazepines, opiates, and muscle relaxers. Id. On physical examination, normal range of motion was noted for neck and musculoskeletal. R. at 361. She was neurologically intact with motor strength of 5/5 and the ability to ambulate without any difficulty. Id. It was noted that her magnesium was low and that her symptoms could be due to all the medications she is on in addition to her hypomagnesemia. Id. A CT scan of the head was performed and was normal. R. at 416.

Ms. Kraft continued to treat at Spectrum after her date last insured with notes in the record from her treatment on March 27, 2018; May 15, 2018; July 27, 2018; September 26, 2018; November 26, 2018; January 25, 2019; March 28, 2019; May 22, 2019; July 24, 2019; and November 11, 2019 when the results of her physical examination were the same as on previous visits except the July 27, 2018 and November 20, 2019 records also report a subjective complaint of numbness and tingling radiating down the bilateral upper and lower extremities and the July 24, 2019, and May 22, 2019 records also note subjective complaint of dull aching pain to the knees, greater on the left. R. at 287, 291, 296, 299, 302, 517, 521, 525, 529, 533 . Her reports of pain were similar as in previous visits, though she also reported in July 2018 that the pain sometimes makes it difficult to sleep. R. at 286, 209, 295, 298, 301, 516, 520, 524, 528, 532. In September 2018, January 2019, and July 2019, she denied falls or injuries since her last evaluation. R. at 290, 520, 532. In March 2019, she reported that she was experiencing weakness in her legs and falling that was found to be due to Zanaflex. R. at 528. She reported getting tangled in a hose and falling in November 2019. R. at 516.  Falls were not noted in the other records. R. at 286, 295, 298, 301,

532. She was started on gabapentin in July 2019, but continued on MS Contin and Norco. R. at 522.

She also continued to treat with Dr. Genovese after her date last insured, with records of treatment dated May 8, 2018; June 7, 2018; August 8, 2018; September 11, 2018; and December 3, 2018. R. at 484-86, 499-503. Usual back pain was noted in June 2018, August 2018, and December 2018. R. at 485, 501, 503. Good mood was noted in June 2018 and December 2018. R. at 501, 503. As noted, much of Dr. Genovese's handwritten records are illegible.

Ms. Kraft returned to the Emergency Department of the NOMC Hospital on October 8, 2018, complaining of pain behind the left knee. R. at 355. She reported mild swelling and pain to her left calf beginning about a week earlier. R. at 356. Upon physical examination, normal range of motion for neck and musculoskeletal were noted. R. at 357. She denied any trauma and it was noted that she had a steady gait "actually here on arrival." R. at 359. She denied any difficulty walking. Id. An x-ray of the knee showed mild medial compartment osteoarthrosis. Id. An ultrasound showed no deep vein thrombosis. Id. She was given Norco and felt much improved. Id.

*State Agency Medical Consultant Findings*

The state agency's medical consultant, Dr. James Crout, performed a review of the medical records[5] and concluded that from April 26, 2017 through December 31, 2017, Ms. Kraft had the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight hour work day; sit for six hours in an eight hour work day; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance

---

[5] The following records were summarized: Ms. Kraft's October 2018 treatment at North Oaks Health System, her November 2018 treatment at Spectrum Neurology Center, and Dr. Genovese's records, which were noted to be illegible. R. at 67.

and kneel; and occasionally stoop, crouch, and crawl. R. at 69-71. Dr. Crout explained that Ms. Kraft has neck and low back pain during the cited period with her neck showing tenderness and imaging showing degenerative disc disease and with her low back showing scoliosis and degenerative disc disease with decreased range of motion. R. at 70. Dr. Crout added that Ms. Kraft walked with an antalgic gait without assistive devices needed. Id.

Upon reconsideration, the stage agency's medical consultant, Dr. Jeffrey Faludi, reviewed the medical records and issued the same residual functional capacity assessment as had Dr. Crout with the identical explanation. R. at 81-83. However, additional medical records were summarized.[6] R. at 78-79.

### Decision of the Administrative Law Judge

The ALJ determined that Ms. Kraft last met the insured status requirements of the Act on December 31, 2017. The ALJ determined that Ms. Kraft did not engage in substantial gainful activity during the period from her alleged onset date of April 26, 2017, through her date last insured of December 31, 2017.

The ALJ next determined that through her date last insured, Ms. Kraft had the following severe impairments: spine disorders and obesity. However, the ALJ determined that through the date last insured, Ms. Kraft did not have an impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Then the ALJ found that through her date last insured, Ms. Kraft had the residual functional capacity to perform light work (meaning that she can lift and/or carry up to 20 pounds occasionally

---

[6] The following records were also summarized: Ms. Kraft's April 2017, July 2017, September 2017, and January 2018, treatment at North Oaks; her February 2017, June 2017, and August 2017 treatment with Dr. Genovese; and her records from Spectrum Neurology were summarized generally. R. at 78-79.

and 10 pounds frequently and can sit, stand and/or walk for six hours in an eight-hour day); except she can never climb ladders, ropes, or scaffolds; she can occasionally stoop, crouch, crawl, and climb ramps and stairs; and can frequently balance and kneel. Of relevance to the present appeal, the ALJ was not persuaded by the opinions of Dr. Beaucoudray set forth in the medical questionnaire date June 2, 2017. The ALJ found that Dr. Beaucoudray's opinion that alternating positions would only provide limited adjustment and that Ms. Kraft would not have the ability to tolerate full-time work were inconsistent with and not supported by the evidence of record, including Dr. Beaucoudray's own treatment notes. The ALJ was persuaded by the opinions of the state medical consultants Dr. Crout and Dr. Faludi, finding them to be consistent with and supported by the evidence of record, including Dr. Beaucoudray's treatment notes and the imaging of Ms. Kraft's spine taken in 2015 and 2017.

Relying on vocational expert testimony, the ALJ then determined that through her date last insured, Ms. Kraft was capable of performing past relevant work as a cashier I because this work did not require the performance of work-related activities precluded by her residual functional capacity. Finally, the ALJ concluded that Ms. Kraft was not under a disability as defined by the Act at any time from the alleged onset date of April 26, 2017, through the date last insured of December 31, 2017.

## **Statement of Issues on Appeal**

Issue No. 1.   Whether the ALJ failed to apply a proper legal standard in evaluating the medical opinion of Ms. Kraft's treating orthopedist and accepting the opinion of a non-examining medical consultant over the treating physician.

## Analysis

### I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues de novo, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

### II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.   **Plaintiff's Appeal**.

*Issue No. 1.*    *Whether the ALJ failed to apply a proper legal standard in evaluating the medical opinion of Ms. Kraft's treating orthopedist and accepting the opinion of a non-examining medical consultant over the treating physician.*

#### a.  *Parties' Arguments*

Ms. Kraft argues that the ALJ erred in failing to follow the requirements of 20 C.F.R. §404.1520c in evaluating the medical opinion of Dr. Beaucoudray, Ms. Kraft's treating physician. She submits that the ALJ rejected this opinion solely on the grounds that it was purportedly

"inconsistent with and not supported by the evidence" including Dr. Beaucoudray's own treatment notes. Ms. Kraft argues that, to the contrary, Dr. Beaucoudray's treatment notes consistently documented chronic pain exacerbated by prolonged sitting and standing. She also argues that the ALJ erroneously concluded that there was no evidence that she was falling. She argues this conclusion is not supported by substantial evidence because by mid-to-late 2017, she began reporting falls due to her legs giving out. She cites her January 2017 report of multiple falls, her October 2017 report that her leg went to sleep and she got up and fell, as well as her June 2017 report that she had hired someone to clean her house. R. at 488, 490, 493. She also points out that on January 30, 2018, she reported to Nurse Klein at NOMC Hospital that her legs had been giving out for approximately one month. R. at 359.

Ms. Kraft argues that under §404.1520c, the ALJ must consider both consistency and supportability and must articulate the basis for findings with regard to the length, frequency, and purpose of the treating relationship. She insists the ALJ here failed to consider the factors and failed to articulate a rationale for his conclusions regarding the persuasiveness of Dr. Beaucoudray's opinion. She argues the ALJ's barebones analysis is wholly inadequate.

Ms. Kraft further argues that the ALJ erroneously found the opinions of the non-examining medical consultants persuasive when they were wholly inadequate and unsupported. She submits that the non-examining medical consultant relied on only two pieces of evidence in assessing her residual functional capacity for the full range of light work: the October 2018 emergency room visit and the November 2018 pain management visit. She argues that on reconsideration, this residual functional capacity was rubber stamped by an ophthalmologist who relied on a scant amount of evidence. She points out that her x-rays reveal 36 degrees of lumbar scoliosis, which Dr. Genovese described as extreme. She argues that the medical consultant ignored this record and

also ignored numerous references to her antalgic gait. She argues that this undermines the supportability and persuasiveness of these opinions, yet the ALJ did not mention any of them. Ms. Kraft argues that under Fifth Circuit precedent, the ALJ should not have relied on the non-examining opinions because they were not based upon consideration of the vast majority of the relevant evidence.

The Commissioner counters that the ALJ considered the record as a whole and properly determined that Ms. Kraft could perform light work with additional restrictions. The Commissioner argues that under the applicable regulations, the ALJ considers a variety of factors in assessing the persuasiveness of an opinion, but the ALJ need only articulate consideration of the supportability and consistency factors. The Commissioner points out that in issuing a new regulatory framework in 2017, the Commissioner chose not to retain the treating source rule that could require deference to the opinion of a treating physician.

The Commissioner argues that the ALJ properly considered the supportability and consistency of Dr. Beaucoudray's opinion in finding it to be unpersuasive. As to supportability, the Commissioner points out that the ALJ noted that in June 2017 (the same month as his opinion), Dr. Beaucoudray's examination notes state that Ms. Kraft "has been doing well," that she was "overall content with her current treatment plan," and that she denied side effects from her medication. Upon examination, Dr. Beaucoudray found that Ms. Kraft had full motor strength in all extremities, some tenderness to palpation on her back, and although she had an antalgic gait, Dr. Beaucoudray noted that she was steady and did not require an assistive device. The Commissioner points out that one month later, Ms. Kraft reported to Dr. Beaucoudray that her medication improved her overall functioning.

As to consistency, the Commissioner submits that the ALJ considered the record as a whole and properly found that it is inconsistent with Dr. Beaucoudray's opinion. The Commissioner argues that Ms. Kraft had normal range of motion in her musculoskeletal system throughout the relevant period, citing Ms. Kraft's October 2018[7] emergency room visit for pain behind the right knee when she had normal range of motion on physical examination and her April 2017 emergency room visit for gastrointestinal issues, when normal range of motion was also noted. The Commissioner also points out that in January 2018, outside the relevant period, she reported that she had experienced weakness in her lower extremities for about two weeks, yet she had intact motor sensation and was able to ambulate without difficulty. The Commissioner argues that Dr. Beaucoudray's conclusory opinion is inconsistent with the examinations in the record and that the ALJ's analysis of the opinion fully satisfies the ALJ's regulatory duties under the new procedures.

The Commissioner also addresses Ms. Kraft's contention that the record shows she had been experiencing falls. The Commissioner argues that the ALJ considered Ms. Kraft's subjective reports of falling and determined that the record did not support her allegation. The Commissioner points out that, to the contrary, the record shows that even though she presented with an antalgic gait, she remained steady on her feet during the relevant period. Citing her October 2018 emergency room visit, the Commissioner adds that Ms. Kraft denied difficulty walking and maintained a steady gait.

Finally, the Commissioner addresses the ALJ's consideration of the prior administrative medical findings. The Commissioner argues that contrary to Ms. Kraft's claim that the physician only considered two pieces of evidence, the evidence received and findings portion of the record show that more evidence was considered. Further, the Commissioner argues that the physician

---

[7] October 2018 is outside the relevant period.

need not mention every piece of evidence in the record. Moreover, although Ms. Kraft claims that her spinal x-ray showing thoracic scoliosis was not considered by the physician, the Commissioner submits that the ALJ did consider this x-ray and appropriately found that Ms. Kraft's spine disorders were a severe impairment. The Commissioner insists that the ALJ's decision is supported and that Ms. Kraft has failed to prove otherwise.

    *b. Analysis*

    The regulations applicable to Ms. Kraft's application provide that no deference or special evidentiary weight is given to a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a). Instead, a series of factors are considered, the most important of which are supportability (e.g., relevant objective evidence and supporting explanations presented by the medical source) and consistency (e.g., consistency of the opinion or finding with evidence from other medical and nonmedical sources). Id. & § 404.1520c(c)(1)-(2). Other factors are the relationship of the physician with the claimant, the length of the treatment relationship, the frequency of the examination, the purpose of the treatment relationship, the extent of the treatment relationship, whether there was an examining relationship, and the medical source's specialization. Id. § 404.1520c(c). The ALJ must explain how the supportability and consistency factors were considered, but is not required to explain how the other factors were considered. Id. § 404.1520c(b)(2). Thus, Ms. Kraft incorrectly asserts that the ALJ's opinion must include an explicit assessment of the length, frequency, purpose of the treatment relationship, and specialization of the doctor.

    The ALJ met his statutory duty by assessing both supportability and consistency. In concluding that Dr. Beaucoudray's opinion was unpersuasive, the ALJ stated, "Dr. Beaucoudray opined that alternating positions would provide the claimant with only limited adjustment, and she

would have limited ability to tolerate full-time work. *These opinions are inconsistent with and not supported by the evidence of record including Dr. Beaucoudray's own treatment notes*." R. at 18 (emphasis added).  In reviewing Dr. Beaucoudray's records, the ALJ had noted Ms. Kraft's reports that her medication had improved her overall functioning and allowed her to participate in daily activities, that she had been doing well, and that she had good days and bad days but was content with her treatment plan. R. at 16-17. The ALJ observed that on physical examination by Dr. Beaucoudray, she consistently showed no acute distress and had 5/5 motor strength in all extremities, although she also had tenderness to palpation and restricted lumbar and cervical extension. Id. The ALJ also noted that Dr. Beaucoudray consistently found Ms. Kraft had an antalgic gait but that she had no unsteadiness and did not require an assistive device. Id. The ALJ concluded that Dr. Beaucoudray's records gave no indication that she was falling twice a week and was essentially chair or bed bound for most of a typical day as she claimed. R. at 17. The ALJ further pointed out that although Dr. Beaucoudray opined that her narcotic medication might cause drowsiness and cognitive slowing, his treatment notes consistently found that Ms. Kraft had normal mood and she never reported that she had any cognitive difficulties. R. at 18. Indeed, she consistently reported to Dr. Beaucoudray that she was not suffering side effects from the medication. Ms. Kraft fails to cite any authority to support finding the ALJ's assessment of Dr. Beaucoudray's opinion lacked the required explanation.

Essentially, Ms. Kraft asks this court to reweigh the evidence. The ALJ relied on numerous inconsistencies between Dr. Beaucoudray's opinions and his own treatment notes and the lack of support for his opinions in his treatment notes. Ms. Kraft points to other treatments notes showing that she consistently complained that her pain was exacerbated by prolonged sitting and standing. Yet, even where other conclusions are possible, the ALJ's decision must be upheld where it is

supported by substantial evidence. See Arkansas, 503 U.S. at 113. Here, the ALJ's assessment of Dr. Beaucoudray's opinion is supported by substantial evidence in the record.

Ms. Kraft challenges the ALJ's assessment of her allegation of falls. The record on this is mixed. Treatment notes reflect a subjective report of "multiple falls" in January 2017. R. at 493. She rolled her ankle on September 2017, but the treatment notes do not reflect that this was due to back pain or numbness in her legs. R. at 362. On her January 30, 2018, one month after her date last insured, she reported a fall as a result of her legs giving out. R. at 305. When she presented to the emergency room the same day she stated that she had been experiencing weakness in her legs for two weeks and that her legs had been giving out on her for a month. R. at 359.  This indicates that she was not experiencing weakness or falls in 2017 before her date last insured. Although she testified at the hearing that she was experiencing falls twice a week during 2017, nothing in the medical records supports this contention. As noted above, she consistently reported to Dr. Beaucoudray that she was not experiencing side effects from medication and upon examination, her mood was normal. The ALJ's conclusion that the record does not support finding that Ms. Kraft was experiencing frequent falls in 2017 is supported by substantial evidence.

Finally, Ms. Kraft erroneously asserts that the state agency medical consultant reviewed only two pieces of evidence. While the initial state agency determination summary of evidence only references two pieces of evidence, the state agency determination on reconsideration summarizes numerous records, as discussed above. Moreover, the explanations by the medical consultants on both applications accurately note that Ms. Kraft's neck showed tenderness and degenerative disc disease on imaging, that her low back showed scoliosis and degenerative disc disease with decreased range of motion,  and that she walked with an antalgic gain without assistive devices. This explanation explicitly refers to records of scoliosis and antalgic gait, medical

evidence that Ms. Kraft claims the consultants ignored. Ms. Kraft's argument that the ALJ should not have relied on the medical consultant opinions because they did not consider the majority of the evidence is unfounded and refuted by the opinions themselves. In consideration of the medical records, the medical consultants limited Ms. Kraft to light work with additional limitations related to climbing, crouching, stooping, and crawling. The ALJ concluded that the medical consultants' opinions were persuasive because they were consistent with and supported by the record, including Dr. Beaucoudray's treatment notes. Ms. Kraft has shown no basis from which to conclude that the ALJ's determination was not supported by substantial evidence. The court finds that it is.

Because the ALJ's assessment of the medical opinions was supported by substantial evidence, the ALJ's decision should be affirmed.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 20) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 26th day of October, 2021.

Janis van Meerveld
United States Magistrate Judge